UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANDREW T. WHITCOMB,

          Plaintiff,

      v.                                            Case No. 16-cv-1000-bhl

DR. JEFFREY MANLOVE,
EMILY STADTMUELLER, and
JENNIFER KACYON,

          Defendants.

## DECISION AND ORDER

      Andrew T. Whitcomb is a Wisconsin state prisoner who is representing himself on claims against three defendants, Dr. Jeffrey Manlove, Emily Stadtmueller, and Jennifer Kacyon, whom he alleges failed to provide him adequate health care for his injured knee. (ECF No. 25.) In a January 14, 2019 screening order, the Court allowed Whitcomb to proceed on six claims alleging that: (1) Dr. Manlove prescribed ineffective pain medication; (2) Dr. Manlove ordered Whitcomb's crutches, cane and wheelchair removed; (3) Dr. Manlove and defendant Nurse Jennifer Kacyon denied Whitcomb an immobilizer from an outside provider; (4) Dr. Manlove delayed scheduling Whitcomb's MRIs and surgery; (5) Kacyon failed to treat Whitcomb on October 2, 2018; and (6) defendant Emily Stadtmueller failed to act when Whitcomb wrote to her complaining about his treatment in 2016. (ECF No. 25 at 6–7.)

      On January 3, 2020, the defendants moved for summary judgment. (ECF No. 52.) Whitcomb responded on March 6, 2020, and the defendants filed a reply brief on March 19, 2020. Having reviewed the parties' submissions, the Court concludes that the defendants are entitled to judgment as a matter of law and the Court therefore grants their motion and dismisses the case.

# BACKGROUND FACTS[1]

Whitcomb has been incarcerated at Waupun Correctional Institution since December 2014. (ECF No. 57 at ¶1.) He has a high school equivalency diploma, but is not a doctor. (*Id.* at ¶7.) At the time of defendants' summary judgment motion, Whitcombe was on administrative confinement for assaulting a staff member on June 13, 2018. (*Id.* at ¶¶10–11.) His status is reviewed regularly. (*Id.* at ¶¶12–13.) Whitcomb has an injured knee, which he first suffered while fighting outside the institution. (*Id.* at ¶8.) He has had two knee surgeries since being incarcerated: one in September 2015 and another in June 2016. (*Id.* ¶9.)

Defendant Dr. Jeffrey Manlove is a physician at Waupun. (*Id.* at ¶2.) Defendant Jennifer Kacyon is a Nurse Clinician II at Waupun, and defendant Emily Stadtmueller was the Health Services Unit (HSU) manger from February 8, 2016 to September 7, 2016. (*Id.* at ¶¶3, 4.) Captain Kyle Tritt, who is not a defendant, has worked for the Department of Corrections (DOC) since 2007. (*Id.* at ¶ 5.) He has been a captain since November 2016 and worked as a Lieutenant before that. (*Id.*)

## A. Medication

Manlove has interacted with Whitcomb on numerous occasions and is familiar with his medical history. (*Id.* at ¶13.) Medical staff have provided Whitcomb with numerous different medications, creams, gels, and patches for his pain. (*Id.* at ¶14.) Whitcomb reported that one of these medications, gabapentin, was somewhat helpful for his pain. (*Id.* at ¶15.) He was found to have misused the medication, however, apparently for diverting it. (*Id.* at ¶16.) Diverting or hiding medication or accepting medical contraband from other inmates is a security risk—inmates could self-harm or overdose or it can be sold and traded among inmates. (*Id.* at ¶17.) Whitcomb has in fact received several conduct reports for diverting medication. (*Id.*)

---

[1] The undisputed facts are largely derived from the facts proposed by the defendants, to which Whitcomb has not responded. Civil Local Rule 56(b)(2)(B) requires that a party who opposes a motion for summary judgment must, within thirty days of service of the summary judgment motion, file "a concise response to the moving party's statement of facts." On April 2, 2019, Magistrate Judge William E. Duffin, the judge to whom the case was referred for pretrial management, issued a scheduling order. That order contained a copy of the relevant local rules, including Civil Local Rule 56. (ECF No. 39.) On January 3, 2020, the defendants filed their motion for summary judgment. (ECF No. 52.) They attached this rule to the motion, as they were required to do in a case involving a pro se plaintiff, so Whitcomb received the rule a second time. (*Id.*) When Whitcomb failed to respond to the motion, Judge Duffin issued an order giving him a final chance to respond and explained what he must do to properly oppose the motion (including responding to the proposed findings of fact). (ECF No. 60.) Despite receiving the rule twice and an explanation of how to respond to summary judgment (including another reminder to follow the rule), Whitcomb did not respond to the defendants' proposed findings of fact. The Court will consider the defendants' facts to be unopposed.

Whitcomb also found the medication Lyrica helpful, but medical staff took him off that medication because he developed blurry vision.  (*Id.* at ¶18.)  He has repeatedly refused to take NSAIDs when prescribed to him, stating that he believes it will cause a GI bleed.  (Ironically, while Whitcomb objects to taking NSAIDs because they may harm his stomach, he has a record of swallowing foreign objects, behavior that poses a far greater risk to his gastrointestinal tract.) .  *Id.*  Whitcomb has been seen by numerous providers, including providers outside of the Department of Corrections, and none has recommended the long-term use of any stronger medications for his chronic complaints of pain.  (*Id.* at ¶20.)  Whitcomb is currently prescribed extra strength Tylenol in liquid form to prevent him from abusing the medication based on his history of misuse.  (*Id.* at ¶21.)  Manlove has considered and rejected the use of narcotics because they are inappropriate for chronic pain.  (*Id.*)

### B.  Wheelchair, Crutch, and Cane

When in general population, Whitcomb was to use a cane or crutches for  distances shorter than 100 feet, and a wheelchair for longer distances.  (*Id.* at ¶22.)  He was not given these items to get around within his cell—only around the larger institution.  (*Id.*)  Sometimes, Whitcomb used a cane instead of crutches because the crutches hurt his armpits or shoulders.  (*Id.* at ¶26.)

Whitcomb states he was without a wheelchair while in the Restrictive Housing Unit (RHU) for an undefined period  in 2015.  (*Id.* at ¶23.)  He claims that someone told him that Manlove ordered that his wheelchair, crutches, and cane be taken away, but he cannot identify any particular officer or nurse who gave him this information.  (*Id.* at ¶24.)

Defendants do not dispute that Whitcomb's wheelchair, crutches, and cane were taken from him when he came to the RHU.  (*Id.* at ¶25.)  Medical devices that do not contain metal parts, such as crutches or canes, are evaluated on a case-by-case basis that considers an inmate's history and need for the device, as well as the security risks in the RHU.  (*Id.* at ¶27.)  Canes and crutches pose a security risk since an inmate could use them to harm himself.  (*Id.*)  They could also be used to hide or transport contraband, including drugs.  (*Id.*)  Generally, inmates with mobility issues in the RHU who are not allowed to have a medical device are provided a wheelchair anytime they leave their cell.  (*Id.* at ¶28.)  Whitcomb was provided a wheelchair during his time in the RHU when he had mobility issues.  (*Id.*)

As a provider at Waupun, Manlove may or may not authorize a medical device, such as a crane or crutches or an arm sling. (*Id.* at ¶29.) Nurses also often authorize an inmate to have a medical device and, generally, Manlove does not contradict a nurse's authorization decision. (*Id.*) After the allowed period of usage for a medical device ends, Manlove reviews the inmate's need and decides whether to renew the authorization. (*Id.*) He bases his decision on whether to renew a medical device on the inmate's medical chart, whether the inmate is consistently using the device and whether the inmate still needs it. (*Id.* at ¶30.) If an inmate is not consistently using a device, that is a good indication he does not need it. (*Id.*)

Whitcomb has a history of not using or misusing medical devices. (*Id.*) Whitcomb reinjured his knee going down the stairs without his knee brace, he did not use his crutches when they were prescribed to him to prevent further injuring his knee, and he refused to use an ACE wrap bandage and knee sleeve. (*Id.*) He also refused to wear his knee immobilizer, including an incident in 2016 when he was observed sprinting up and down the prison range hall. (*Id.*) He has also received a conduct report for smuggling drugs in his cane. (*Id.* at ¶36.)

When the time allotted for use of a device expires, a correctional officer will usually remove it from the inmate's cell and return it to the HSU. (*Id.* at ¶32.) Generally, it is up to an inmate to request that his use of a medical device be extended. (*Id.*) An inmate can submit a Health Services Request (HSR) or request an appointment with a nurse or provider. (*Id.*) Occasionally, if Manlove or a nurse remembers that an inmate's medical restriction is set to expire, they will schedule an appoint to discuss its continued need. (*Id.*)

A provider or HSU manager can take away an inmate's medical device for misuse. (*Id.* at ¶34.) For example, if an inmate uses a device as a weapon, it will be taken. (*Id.*) If it is non-essential, the inmate will not get it back. (*Id.*) But if it is essential, Manlove will try to find another device that can help the inmate in the same way. (*Id.*) In the case of an inmate misusing crutches, for example, Manlove may prescribe the use of a wheelchair for mobility. (*Id.*)

Manlove does not recall specifically authorizing, renewing, or rescinding any of Whitcomb's medical devices. (*Id.*) Manlove, nurses, physical therapy, and the Special Needs Committee have authorized many medical devices for him. (*Id.* at ¶31.) Currently (or at the time the motion was filed), Whitcomb is authorized to use an abdominal binder, he must be handcuffed in front of his body, he has a "no kneel" restriction, and he has use of a wheelchair

4

outside of his cell hall.  (*Id.*)  He also has permanent medical restrictions for no strenuous sports, a knee brace or immobilizer and medical shoes.  (*Id.*)

### C. Immobilizer

An immobilizer is a leg brace that goes from the hip to the ankle that prevents the leg from bending.  (*Id.* at ¶37.)  The immobilizer keeps the knee straight, while a regular knee brace stabilizes the knee but allows the leg to bend and go through a normal range of motion.  (*Id.* at ¶38.)

Whitcomb received an immobilizer in Spring 2018, while he was in the RHU.  He was told to use it to avoid putting pressure on this leg. (Id. at ¶37-40.)   The immobilizer had metal parts, like every other immobilizer Whitcomb had received.  (*Id.* at ¶39.)  Whitcomb alleges that Kacyon told him Manlove said he could not have the immobilizer, and he believes that Kacyon should have spoken to the HSU manager to override that decision.  (*Id.* at ¶43.)  He does not know if it was denied due to a security issue or the need for modification.  (*Id.* at ¶44.)

Whenever an inmate returns from an off-site appointment or hospital stay with a medical device, that medical device must be approved by the inmate's primary provider at Waupun.  (*Id.* at ¶46.)  For inmates in the RHU, that device must then be approved for use in the RHU.  (*Id.*)  Use of a medical device in the RHU is evaluated on a case-by-case basis and considers an inmate's history and need for the device.  (*Id.* at ¶47.)  Medical devices must be evaluated for safety because many contain metal pieces that can be removed and fashioned into a weapon (or weapons).  (*Id.*)

In 2015, Whitcomb received a conduct report for fashioning weapons from an immobilizer.  (*Id.* at ¶41, ¶47.)   In that incident, metal pieces were removed from the immobilizer's casing and sharpened into  potential weapons.  (*Id.*)  Whitcomb does not dispute that he received the conduct report for the possession, manufacture, or use of weapons, but maintains he did not actually create the weapon from the metal parts).  (*Id.* at ¶41.)  After he received that report, Waupun discontinued the use of the immobilizer style Whitcomb had used to fashion weapons (or at least extricate the metal parts from).  (*Id.* at ¶56.)

It is general practice at Waupun for a nurse to meet with an inmate as soon as possible after he returns from an off-site medical appointment involving surgery/certain procedures or an overnight hospital stay.  (*Id.* at ¶48.)  At that time, discharge instructions and recommendations can be reviewed with an inmate.  (*Id.*)  Whitcomb returned to Waupun with a knee immobilizer

5

after an inpatient stay at UW Health University Hospital related to abdominal complaints. (*Id.* at ¶49.) A University Hospital doctor gave him the immobilizer, not Manlove. (*Id.*) Upon Whitcomb's return, Captain Kyle Tritt (not a defendant) confiscated the immobilizer because medical devices containing metal parts are not allowed in the RHU until they have been evaluated for security concerns. (*Id.*) He was not allowed to have it that day because of his history of making weapons from metal parts in immobilizers. (*Id.* at ¶54.) And that is a particular security risk in the RHU—the weapons could also be used by an inmate for self-harm purposes. (*Id.* at ¶55.)

Kacyon met with Whitcomb the day he returned from the hospital to discuss his specific discharge instructions and recommendations with him. (*Id.* at ¶50.) She explained to him that his provider would further review his discharge information, offered him an alternative to the brace, gave him information on Nurse Clinician III Larsen's updates on his brace status, and told him he would see Manlove for follow-up to discuss any medical concerns. (*Id.*) Kacyon did not have anything to do with the decision to confiscate Whitcomb's new immobilizer. (*Id.* at ¶51.) She is a nurse and not involved in security and safety decisions. (*Id.*) She offered Whitcomb an ACE elastic wrap to help immobilize his knee since he could not have his immobilizer, but he refused. (*Id.*) As an alternative, Whitcomb was issued the use of a wheelchair for distance by the Special Needs Committee. (*Id.*)

On April 10, 2018, HSU learned that Whitcomb was in general population and could have his knee immobilizer. (*Id.* at ¶52.) Kacyon informed Larson that Whitcomb's immobilizer was in the physical therapy department so the metal could be removed per Waupun security requirements. (*Id.*) Unless it is a life-threatening decision, Manlove generally will agree with what RHU security decides regarding the use of a medical device in RHU since security is their area of concern. (*Id.* at ¶53.) When Whitcomb was denied his immobilizer on April 2, 2018, Manlove didn't feel it was a life-threatening situation. (*Id.* at ¶54.)

### D. Delay in Scheduling MRI and Surgery

Whitcomb has had multiple MRIs and numerous x-rays during his incarceration, as well as nerve testing. (*Id.* at ¶57.) He believes MRIs should have been scheduled "way sooner," and within two to three months at most. (*Id.* at ¶¶58–59.) He also believes that Manlove delayed the scheduling of the MRI and could have talked to the scheduler to make it happen sooner. (*Id.* at ¶60; *see also id.* at ¶62.)

Whitcomb had surgery in 2015 and again in June 2016 and believes that the second surgery should have occurred sooner than it did. (*Id.* at ¶63.) He believes that Manlove delayed the surgery because he believes that Manlove has a say in whether the surgery is done immediately "or takes forever." (*Id.* at ¶64.)

Before 2018, Manlove had to submit a prior authorization requests for an inmate to be seen by an off-site provider. (*Id.* at ¶65.) The Associate Medical Director had to approve the request, who met with the Class II Committee every two weeks. (*Id.*) Manlove, as the requesting doctor, would present his case for the need for an outside provider. (*Id.*) After 2018, Manlove can order a consult or appointment with an outside provider for specialty surgeries (like orthopedics) without the prior authorization of the Associate Medical Director or Class II Committee. (*Id.* at ¶66.) Once he decides an inmate needs an off-site consultation or appointment, Manlove puts that information in Waupun's HSU electronic medical records system. (*Id.* at ¶67.) Scheduler Tya Hauge (not a defendant) will then proceed to schedule an off-site consultation or appointment; Manlove doesn't schedule any appointments with off-site providers. (*Id.*) He is also not involved in the selection of the off-site doctor. (*Id.* at ¶68.) That is up to the hospital, and so is when a consultation or surgery will take place. (*Id.*) Inmates in need of emergency medical treatment are sent to the nearest emergency room. (*Id.*)

### E. October 2, 2018 Incident

Whitcomb's leg "popped out of place" on October 2, 2018 while he was walking around in his cell in the RHU. (*Id.* at ¶69.) Kacyon went to the RHU at Whitcomb's request to address his left knee pain, but she was not able to assess him at that time because he would not follow RHU security directions to be removed from his cell and taken to an exam room. (*Id.* at ¶70.) As a nurse, Kacyon is not allowed to enter any cell for any reason in RHU until an inmate has been secured. (*Id.*) This is for the protection of Kacyon, Waupun staff, and the inmate. (*Id.*)

According to Whitcomb, Kacyon told him she wanted to bring him to an exam room in the RHU. (*Id.* at ¶71.) He was told to stand up, come to the door and turn on his light. (*Id.* at ¶72.) He told the C.O. and the nurse that he could not stand up and it was considered a refusal when he did not comply. (*Id.*) He was angry, agitated, yelling and cursing during the encounter. (*Id.* at ¶73.) Specifically, he says he told Kacyon, "You will fucking come in here and pop my knee back in." (*Id.* at ¶74.)

7

Kacyon recalls Whitcomb yelling at her to enter his cell and demanding she pop his knee back in, as reflected in the refusal of recommended health care from October 2, 2018. (*Id.* at ¶75.) Before her shift ended, Kacyon told RHU Sergeant Fisher (not a defendant) that Whitcomb still needed to be assessed for his left knee pain. (*Id.* at ¶76.) She also told third-shift nurse Mark Jensen (also not a defendant) that she was not able to assess Whitcomb and that he would need to try later. (*Id.*) Jensen was able to assess Whitcomb around 10:50 p.m. (*Id.* at ¶77.)

### F. Stadtmueller Letter Claim

According to Whitcomb, he sent Stadtmueller a request slip in 2015 or 2016 complaining about the insufficiency of his treatments. (*Id.* at ¶78.) He claims she refused to do anything because he got a response indicating she would not do anything (though he cannot recall exactly what the response said). (*Id.* at ¶79.)

Stadtmueller was hired as Waupun's Health Services Manager in February 2016. (*Id.* at ¶82.) Before Stadtmueller was hired, Chrystal Marchant served as the HSU Interim-Manager. Marchant became the HSU Assistant Manager after Stadtmueller was hired. (*Id.*) During Stadtmueller's onboarding time, she and Marchant would split letters and Interview/Information Requests from inmates to ensure questions and concerns were addressed as timely as possible. (*Id.* at ¶83.)

Between February 8, 2016 and September 7, 2016, Whitcomb sent one Interview/Information Request to Stadtmueller about his "pain." (*Id.* at ¶80. Marchant replied on April 25, 2016 and informed Whitcomb he had Tylenol and pain-relieving gel for his knee pain. (*Id.* at ¶81.) She also told him that his provider did not believe it was in his best interest to prescribe other pain medications because of his history of overdosing and medication misuse. (*Id.*) She also indicated that he had been seen running down the cell hall. (*Id.*)

HSMs are not authorized to order a referral to an outside provider or specialist and they cannot "force" a provider to pursue a certain course of treatment. (*Id.* at ¶84.) Only advanced care providers can make those decisions. (*Id.*)

### ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

8

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. Applicable Law

Though Whitcomb is proceeding on six different claims, each of them arises under the Eighth Amendment and its prohibition of cruel and unusual punishment, which requires prisons to provide medical care to inmates. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007). Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates "deliberate indifference to serious medical needs of prisoners." *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) (citations omitted). This standard contains both an objective element—that the medical needs be sufficiently serious—and a subjective element—that the officials act with a sufficiently culpable state of mind. *Id.*

#### 1. Pain Medication Claim

The Court allowed Whitcomb to proceed on a claim based on his allegations that Manlove failed to provide him with pain medication to address his knee ailments (the exact dates of his claim were not clear). (ECF No. 25 at 6.) The record shows that Manlove and other staff have prescribed Whitcomb numerous different medications, creams, gels and patches to address

9

his pain. (ECF No. 57 at ¶14.) At one point, he reported that a particular medication—gabapentin—was working for him (*id.* at ¶16), but then he received a conduct report for diverting medication (*id.* at ¶17). Lyrica also worked for him for a while, but then he developed blurry vision. (*Id.* at ¶18.) Whitcomb refuses to take NSAIDs because of a fear of a GI bleed. (*Id.* at ¶19.) At the time the defendants filed the motion, Whitcomb was taking extra strength Tylenol (in liquid form to prevent misuse based on his history). (*Id.* at ¶21.) Manlove considered prescribing narcotics but rejected the idea because they are inappropriate for chronic pain. (*Id.* at ¶21.)

Whitcomb's original claim—that Manlove didn't provide him with medication to address his pain—is not supported by the record. At best, Whitcomb disagrees with Manlove. And disagreement with a doctor's medical judgment is not enough to support a claim under the Eighth Amendment. *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (citing *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)); *see also Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (affirming dismissal at screening stage where plaintiff "at best" claims "a disagreement with medical professionals about his needs"). Manlove exercised his medical judgment when deciding that narcotics would be inappropriate for Whitcomb's long-term pain. (ECF No. 57 at ¶21.) And no other provider, including those outside of the DOC, have recommended Whitcomb take any stronger medications long-term. (*Id.* at ¶20.)

In the case of pain management, the Seventh Circuit has specifically explained that "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Nothing in the record suggests that this is such a situation. Whitcomb experiences chronic knee pain. He takes extra strength Tylenol. He will not take a NSAID even though he could. There is no basis in the record for a jury to find Manlove did not exercise his medical judgment in prescribing medication to address Whitcomb's pain. He is entitled to summary judgment on Whitcomb's medication claim.

### 2. Wheelchair, Crutches, and Cane Claim

The Court also allowed Whitcomb to proceed against Manlove on a claim based on his allegation that Manlove took away his wheelchair, crutches and cane. (ECF No. 25 at 6.) Whitcomb's claim fails because he has provided no admissible evidence that Manlove was involved in any decision to take away his wheelchair, crutches, or cane. Liability under §1983 is

limited to employees who are personally responsible for depriving a plaintiff of a constitutional right. *Burks v. Raemisch*, 555 F.3d 592, 595–96 (7th Cir. 2009).

All Whitcomb has offered are statements from an unidentified C.O. or nurse that Manlove ordered the items removed from his cell. Whitcomb's offered evidence is hearsay because he is giving a statement containing information that he learned from someone else. *See* Fed. R. Evid. 801(c). It is secondhand information. That means it is not admissible and the Court cannot consider it at summary judgment. *See* Fed. R. Civ. P. 56(c)(2); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016).

Even if Whitcomb had provided evidence that Manlove took away his wheelchair, crutches, and/or cane, there is no evidence in the record to support a finding that Manlove doing so was deliberately indifferent. Manlove has said that he does not recall any specific incident, but there are established procedures with respect to medical devices. The record shows that medical devices are generally authorized on a temporary basis and when that allotted time expires, a correctional officer gets the device from the inmate and returns it to the HSU. (ECF No. 57 at ¶32.) If an inmate needs a device longer than it was ordered for, it is generally up to him to ask that the time be extended. (*Id.* at ¶33.) If Manlove (or a nurse) remembered the time for a device was going to expire, he would schedule an appointment with the inmate to discuss its continued need. (*Id.*) When deciding whether to renew a medical device, Manlove looks at the inmate's chart, whether the inmate is using the device consistently, and whether the inmate still has a medical need for it. (*Id.* at ¶30.) Whitcomb has presented nothing to suggest Manlove ever took away a medical device arbitrarily. To the contrary, the record shows Whitcomb has had a medical device that he did not use or used improperly: he reinjured his knee going down the stairs without his brace, he did not use his crutches when prescribed, he refused to use an ACE bandage and knee sleeve, and he regularly refused to wear his immobilizer. (*Id.*) On one occasion in 2016, he was seen sprinting up and down the prison range hall. (*Id.*)

The record also establishes that there are particular procedures in place when an inmate is in RHU that further limit what types of medical devices an inmate can have. (*Id.* at ¶28.) There is no evidence in the record that Manlove ever arbitrarily or unjustifiably discontinued Whitcomb's use of a wheelchair, crutches, or cane.

### 3. Immobilizer Claim

Whitcomb is proceeding on a claim against Manlove and Kacyon based on his allegations that they confiscated his immobilizer. (ECF No. 25 at 6.) Whitcomb returned from his inpatient stay with an immobilizer prescribed by a doctor at the hospital. (ECF No. 57 at ¶49.) Once he returned, Captain Kyle Tritt (not a defendant) confiscated the immobilizer because it, like all medical devices containing metal parts, had to be evaluated to be sure it was safe to have in the RHU. (*Id.*)

Whitcomb's claim fails because the record establishes that neither Manlove nor Kacyon was responsible for taking away Whitcomb's immobilizer. As the court noted above, liability under §1983 requires that the official is personally involved in and responsible for the alleged deprivation. *Burks*, 555 F.3d at 595–96. Instead, Tritt, who Whitcomb did not sue, confiscated the immobilizer under established institution safety and security policies. Furthermore, the record establishes that the lack of access to his immobilizer did not compromise his safety. If he needed to leave his cell, he had access to a wheelchair. (ECF No. 57 at ¶22.)

In his response brief, Whitcomb argues that the C.O. who transported him from the hospital said that Kacyon instructed the C.O. to take away his immobilizer for approval by Manlove or another provider. (ECF No. 6 at 1–2.) However, like his statement that "someone" told him Manlove authorized the discontinuation of his medical devices, this argument offers only inadmissible hearsay— Whitcomb argues that a C.O. told him what Kacyon told the C.O. Whitcomb also argues that Tritt made a false statement in his declaration. (*Id.* at 1.) This argument is also unavailing. The alleged misstatement has to do with the date Whitcomb fought a correctional officer. Tritt wrote it occurred June 13, 2018, but it actually happened June 6. The date of the disposition for Whitcomb's conduct report *was* June 13, 2018, so it is nearly certain Tritt transposed the dates. Regardless, though, the actual date has no bearing on summary judgment. Tritt's misstatement does not constitute an intentional false misrepresentation to the court and does not undermine Tritt's declaration.

To the extent Whitcomb claims that Manlove, Kacyon, or any other official who knew of his complaints should be liable for failing to override the security decision, his claim is without merit. As the Seventh Circuit has explained:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to

12

> efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. [The plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right.

*Burks*, 555 F.3d at 595. Neither Manlove nor Kacyon (or any other official) was required to question or override established safety policy. Both Manlove and Kacyon are entitled to summary judgment on this claim.

### 4. Scheduling MRIs and Surgeries

Whitcomb faults Manlove for not expediting his MRIs or 2016 surgery. As the Court has already explained twice, §1983 requires a defendant be personally responsible for a deprivation or violation to be liable. *Burks*, 555 F.3d at 595–96. Whitcomb's claim fails for two reasons: (1) Manlove does not schedule these procedures and (2) Manlove cannot control the outside providers' schedules. (ECF No. 57 at ¶¶67–68.) Whitcomb's bald speculation that Manlove could somehow influence either the person responsible for scheduling or the outside providers is just that—speculation. It cannot create a dispute of fact, and Manlove is entitled to summary judgment on this claim.

### 5. October 2, 2018 Incident

The Court also allowed Whitcomb to proceed on a claim against Kacyon based on his allegations that she failed to treat him after he injured himself on October 2, 2018. (ECF No. 25 at 6.) The record establishes that Kacyon reported to Whitcomb's cell after he injured himself. (ECF No. 57 at ¶70.) But because of security restrictions, she could not enter his cell (or any other cell in the RHU). (*Id.*) Kacyon and an officer tried to get him to come out of his cell to be taken to an exam room, but he would not comply. (*Id.* at ¶¶71–72.) Instead Whitcomb yelled at Kacyon, "You will fucking come in here and pop my knee back in." (*Id.* at ¶74.) He was angry and agitated, and because he would not comply with security directives, Kacyon could not see him. (*Id.* at ¶76.) Kacyon documented what happened in a refusal form and alerted both the RHU sergeant and the nurse on the next shift that Whitcomb still needed to be seen. (*Id.* at ¶76.)

There is no basis to find that Kacyon was deliberately indifferent. She tried to see Whitcomb. His refusal to follow security directives is why she was unable to treat him—he

13

caused the problem, not Kacyon. And even after he refused to comply, she took steps to make sure someone else tried to see him. She is entitled to summary judgment.

### 6. Letter to Stadtmueller

Finally, the Court allowed Whitcomb to proceed on a claim against Stadtmueller based on his allegations that he wrote to her about "what was going on and have her do something about it, but she refused to do so." (ECF No. 25 at 6 (citing ECF No. 20 at 4).) At screening, the Court noted that the claim was "thin"—it was not clear what he wrote her or whether he asked for specific help. That is still true. The record shows one Interview/Information request to Stadtmueller. (ECF No. 57 at ¶80.) He wrote about his pain. (*Id.*) Marchant (not a defendant) replied, telling him he had Tylenol and pain-relieving gel, that his provider did not believe other pain medications were in his best interest given his history of overdosing and medication misuse, and indicated he had been seen running down the cell hall. (*Id.* at ¶81.)

The Court is not sure what Whitcomb thinks Stadtmueller did wrong. If he thinks Stadtmueller should have responded rather than Marchant, that does not form the basis of a constitutional violation. They split the work of responding to inmate correspondence; he has no grounds to demand they do their work a different way. If he thinks Stadtmueller should have done something to intervene, she had no authority to do so. She could not order a referral to an outside provider or specialist, and she could not force Whitcomb's provider to pursue a particular course of treatment. (*Id.* at ¶84.) As the Court explained above, bureaucracies can divide tasks and prisoners cannot demand that one official do another official's job. *Burks*, 555 F.3d at 595. There is no basis to find Stadtmueller was deliberately indifferent to Whitcomb's medical needs (i.e. pain), and she is entitled to summary judgment.

## CONCLUSION

**THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 52) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good

cause or excusable neglect for not being able to meet the 30-day deadline.  *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b).  Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment.  The Court cannot extend this deadline.  *See* Federal Rule of Civil Procedure 6(b)(2).  Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment.  The court cannot extend this deadline.  *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 14th day of October, 2020.

s/ Brett H. Ludwig  
Brett H. Ludwig  
United States District Judge